## Brossman *versus* Lehigh Valley Railroad Co.

1. When an employé, after having had the opportunity of becoming acquainted with the risks of his situation, accepts them, he cannot complain if subsequently injured by such exposure. By contracting for the performance of hazardous duties he assumes such risks as are incident to their discharge from causes open and obvious, the dangerous character of which causes he has had opportunity to ascertain.

?. When the service of a brakeman is extra hazardous and dangerous on account of a bridge being of insufficient height, of which the brakeman had knowledge while employed, and he continued in the service without objection, he assumed the dangers incident to the service from the bridge in question, and there can be no recovery on account of his death caused by the bridge. The negligence of the employer is waived by the employé remaining in employment without protest or promise of amendment. This waiver cannot be affected by the rapidity or promptness with which he may be required to act at the time of the accident.

March 9th, 1886. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. CLARK, J., absent.

ERROR to the Court of Common Pleas of *Northampton county:* Of January Term 1886, No. 58.

This was an action on the case brought by Catharine Brossman against the Lehigh Valley Railroad Company to recover damages for the death of her husband, caused by the alleged negligence of the said company.

The following are the facts of the case as they appeared on the trial, before SCHUYLER, J.:

William Brossman, husband of the plaintiff, was employed by the defendant company on a night freight train. He entered their employment late in August, 1879, and was killed on October 18th, following.

The train on which he ran left Easton about 8.30 P. M. that evening. When they reached East Penn. Junction the train took on four cars, which were to be left at Hokendauqua. This place is about four miles above the junction. Between these two places there are three or four bridges across the railroad, under which the cars had to pass, at all of which the space between the bridge and cars did not permit the standing brakeman to pass under them.

The duty of deceased at or about the time of the accident was to find or assist in finding the cars which were to be left off at Hokendauqua. Frank Hart, the fellow brakeman, says, at the junction they took on four cars for Hokendauqua. They were together, and formed one continuous line by themselves, and when one was found the brakeman then had them all.

Hart and Brossman, the two brakemen, after leaving the junction station, while the train was going at thirty-five miles an hour, at which rate it would require about eight or ten minutes to go from the station to Hokendauqua, had to find these cars and be on them in order to detach them at Hokendauqua while the train was in motion. It was Brossman's duty to detach the cars. He was to cut them from the train below, and Hart was to cut them off above, and then Brossman was to hold the rear cars, these four among them. He was to hold the lower cars with the brake, and Hart would

shift them in. The train was to be cut in two, and Brossman was to be at the brake of the rear cars. He and Hart had passed from one car to another on the top, and had already been on three.

They had not found the four particular cars for which they were hunting. Hart just then imagined he had lost a way-bill, so he went in search for that, and Brossman helped him. It appears that they were not found till after the accident. The way-bills were in Hart's charge. There is no evidence that Brossman had any duty to perform as to them.

Hart and Brossman were on one car. Hart was stooping down to look over his way-bills. Brossman came and was going to step over to help him count the way-bills, when the accident happened.

The plaintiff proved that the bridge was fifteen feet high, and that the car on which Brossman was, was twelve feet high; that the train was running at the rate of thirty-five miles an hour; that there were no lights to indicate the position of the bridge; nothing to warn the men that they were approaching the danger; that it was impossible to see the bridge on that night; that there were ten other bridges of the same height, within five miles of this one; that the defendant company had erected the bridge. The plaintiff claimed that the company were guilty of negligence in exposing Brossman to unnecessary risk; that the failure of the company to provide proper safeguards caused his death. The Court on motion entered a compulsory nonsuit, and subsequently refused a motion to strike it off, deciding, 1st, that Brossman was guilty of contributory negligence, and 2d, that the defendant was not guilty of negligence, filing the following opinion :

Where a railroad company voluntarily subjects its employés to dangers which it ought to provide against, and an accident happens to an employé from a want of proper provision against such danger, the company is undoubtedly liable. But, on the other hand, it is not liable for accidents happening from the ordinary risk and dangers of the business, for it is a legal presumption that the servant assumed the risk of such accidents when he entered the service of the company. Again, we may further extend this rule by saying that the servant or employé assumes the risk of all dangers, however they may arise, against which he may protect himself by the exercise of ordinary observation and care : Pittsburgh & Connelsville R. R. Co. *v.* Sentmeyer, 11 Norris, 280. '

This may be very poor law. I think it is otherwise; but, whether good or bad, it is the law of this state, and to it the judges of the state must yield obedience. If, therefore, the evidence given by the plaintiff above shows that the accident

[Brossman v. Lehigh Valley R. R.]

by which Brossman lost his life could have been prevented by the exercise of ordinary observation and care on his part, then the plaintiff cannot recover. Let us see how the fact is.

According to the plaintiff's own showing, William Brossman, for nearly two months immediately preceding his death, had been in the employ of the defendant as regular brakeman. During this time he frequently passed under the bridge where he lost his life. Before he became regular brakeman, he had acted as extra brakeman about nine months, in which capacity he also passed and repassed under this bridge many times. He, therefore knew, or what amounts in law to the same thing, he had an opportunity to know the exact location of the bridge, how high it was, and just how much care was required to avoid collision with it. The night on which he lost his life was very dark and " fearfully stormy," a fact which, in itself, would have quickened any man of ordinary prudence into greater watchfulness. The train on which he was employed had taken on four cars at East Penn Junction, which he knew to be only a short distance below the bridge, and thus he had notice that the bridge was near at hand. He was on the top of a car which was too high to admit of his safely passing under the bridge without stooping.

Can there be any question that it was his duty under such circumstances, to be on a sharp lookout? How was the fact? As the train was nearing the bridge, Frank Hart, a fellow brakeman, was standing on one of the box cars in a somewhat stooping position, examining his waybills, and Brossman stood alongside of him, the two lighted lanterns of the men being near by. Hart's account of the situation is as follows : " Then I thought I had lost one of my waybills, and we came back again, and just as I stooped down to count my waybills the bridge hit him. He was going to stoop over at the same time to help count the waybills, and then this thing happened. The following questions put to Hart on cross-examination, with his answers, throw further light on the subject: " Q. You did not watch out for the bridge, did you? A. No; we had our mind on our work. Q. And neither you nor Brossman watched out for the bridge ? A. No; we did not think of it." Was a bolder case of contributory negligence ever brought before a Court ?

But it is argued that, nevertheless, the question of contributory negligence was for the jury. I do not so understand the law. The foregoing are the uncontradicted facts, as shown in the plaintiff's own testimony. " In such a case," says AGNEW, C. J., in Central Railroad v. Feller, 4 W. N., 160, " the question becomes one of law." And in Penna. R. R. Co. v. Werner, 8 Norris, 64, STERRETT, J., says : " When the facts are admitted,

or so clearly and conclusively proved as to admit of no reasonable doubt, it is the duty of the Court to declare the law applicable to them."

But there is another difficulty in the way of the plaintiff's recovery quite as serious as the one we have been considering. Whilst it is true, as we have seen, that where a railroad company voluntarily subjects its employés to dangers which it ought to provide against, and an accident happens to an employé from a want of proper provision against such danger, the company is undoubtedly liable; it is at the same time equally true, that where the danger is an obvious one, of which the employés either had or ought to have had knowledge, in every such case there arises a legal presumption that the employé assumes the risk.

In Green & Coates Streets Passenger Railway *v.* Bresmer, 10 W. N., 380, MERCUR, J., says: "A servant, however, assumes the risk naturally and reasonably incident to his employment. He is not bound to risk his safety in the service of his master, and may if he see fit, decline any service in which he reasonably apprehends injury to himself. Inasmuch as the relation of master and servant cannot imply an obligation on the part of the master to take more care of the servant than he may reasonably be expected to take care of himself, the servant cannot complain if he is injured by exposure, after having the opportunity of becoming acquainted with the risks of his employment and accepts them."

So, in Owen *v.* New York Central Railroad Company, 1 Lansing, 108, the Supreme Court of the state of New York lay down a law as follows: "An employé, who contracts for the performance of hazardous duties, assumes such risks as are incident to their discharge, from causes open and obvious, the dangerous character of which he has had opportunity to ascertain. A brakeman, in the employ of a railroad company, while discharging duties in the line of his employment upon the roof of a freight car, was carried against a highway bridge and sustained injuries, for which he brought an action against his employer. The brakeman had entered into the employment of the company, with knowledge of the position and height of the bridge, and he had opportunity of informing himself as to its continuance in the same position. Held, that the plaintiff should have been nonsuited, the danger from the bridge being already incident to the labor he undertook to perform."

So, in Gibson *v.* Erie Railroad company, 18 Sickles, 449, the Court of Appeals in the same state declare the law to be as follows: "Where a servant enters upon employment from its nature necessarily hazardous, he assumes the usual risks and perils of the service, and all those risks which are apparent to

ordinary observation.  If he accepts service with knowledge of the character and position of structures, from which employés might be liable to receive injuries, he cannot call upon his master to make alterations to secure greater safety, or in case of injury hold him liable."

And the decisions by the highest Courts of other states, so far as I can discover, have been uniformly in the same direction.  I will content myself with a bare reference to some of them : Baltimore & Ohio Railroad Company v. Stricker, 51 Md., 47 ; Baylor v. Delaware, Lackawanna & Western Railroad Company, 40 N. J., 23 ; Davitt v. Pacific Railroad Company, 50 Mo., 302 ; Rains v. St. Louis, Iron Mountain & Southern Railroad Company, 71 Mo., 164 ; Clark v. St. Paul & Sioux City Railroad Company, 2 Am. & Eng. Railroad Cases, 240.

This may be hard law——I am not prepared to say that it is—— but if it be, the remedy is with the law-making power.  The duty of the Courts is to administer the law as they find it.  They have no power to alter it.  If employés of railroad companies think that the law as it stands militates against their just rights, they must appeal to the legislature.  The Courts are powerless.

I think I have shown that the case of the plaintiff as it stood at the close of their evidence was fatally defective in two particulars, 1st, in disclosing contributory negligence on the part of William Brossman, and 2d, in failing to show negligence on the part of the defendant.  Either of these defects, standing alone, would be sufficient to prevent a recovery by the plaintiff.  It follows that the present motion cannot prevail.

And now, October 8th, 1883, the motion to strike off the nonsuit entered at the trial, is denied.

The plaintiff thereupon took this writ assigning for error the refusal of the Court to take off the compulsory nonsuit.

*Edward J. Fox & Son*, for plaintiff in error.—1. Is there a fixed and unvarying standard by which the duty of master and servant can be accurately determined in each case ?  Is there a rule of law which can be applied to every case, and enable a Court to declare what is, and what is not, negligence ?  If there is, then the entry of the compulsory nonsuit was not error, but if not, then this case should be submitted to the jury.

We start with the presumption that Brossman did all that was necessary for him to do, and this stands until overthrown by proof to the contrary : Schum v. Penn. R. R. Co., 11 Out., 9.  This presumption is not controverted by any testimony in the case : Beatty v. Gilmore, 4 Harris, 463 ; Wild v. Gas Light Co., 29 C. L., 350 ; Hays v. Gallegher, 72 Pa. St., 136.

[Brossman *v.* Lehigh Valley R. R.]

" What is and what is not negligence in a particular case is generally a question for the jury and not for the Court. It always is when the measure of duty is ordinary and reasonable care. In such cases the standard of duty is not fixed, but variable. Under some circumstances a higher degree of care is demanded than under others, and when the standard shifts with the circumstances of the case, it is in its very nature incapable of being determined as a matter of law, and must be submitted to the jury to determine what it is and whether it has been complied with : " Born *v.* Plank Road Co., 12 W. N. C., 283 ; McIlvaine *v.* Lantz, Id. p., 267 ; Fritsch *v.* Allegheny, 10 Nor., 226.

2. It is a familiar principle that the master must adopt, provide and maintain appliances and means, which will permit the servant to discharge his duties with reasonable safety and without exposure to unnecessary or extraordinary risk.

This duty, however, varies of necessity, in each case. The duty incumbent upon a railroad company differs from that imposed on the owners of a blast furnace, or of a rolling mill, or on a mining company, or in the numberless other instances in which this relation of master and servant exists.

It is in each case a question of fact, illustrated by various circumstances, and no fixed or determined criterion can be established to gauge all cases.

" If there be any evidence of negligence on the part of the defendant (a master) it must be submitted to the jury ; it is error to direct a nonsuit : " Murphy *v.* Crossan, 2 Out., 495 ; McCully *v.* Clark, 4 Wr., 406 ; Baker *v.* Fehr, 1 Out., 70 ; Rummell *v.* Dillworth, Porter & Co., 17 W. N. C., 90.

*B. F. Fackenthall* and *R. E. Wright*, (*William Fackenthall* and *H. S. Drinker* with them), for defendant in error.—1. The existence and maintenance of bridges over a railroad too low for an employé to pass through under them standing on top of a box car, without injury, is not a violation of a duty which the railroad company owes to its employés, who are required to be on top of such cars in performing their duties: Wells, Administratrix, *v.* Burlington &c. Railroad, 2 Thompson's Cases, 243.

A party by remaining in employment where he is exposed to danger will be presumed to assent to the risks and hazards to which he is thereby exposed. Thus, where a brakeman six feet tall had for four years continued to brake upon a portion. of the railroad where bridges crossed the track but five feet above the cars, so that riding on the top of the cars it was necessary for him to stoop to pass under them, held that he would be deemed to have taken the risk of injury therefrom :

[Brossman *v.* Lehigh Valley R. R.]

Baylor *v.* Del. Lack. & Western Railroad Company, 40 N. J., 23; Baltimore & Ohio R. R. *v.* Stricker, 51 Md., 47; Rains *v.* St. Louis, Iron Mt. R. R., 71 Mo., 164; Owen *v.* N. Y. Cent. R. R., 1 Lans., 108.

If a servant accepts service with a knowledge of the position of structures from which he has occasion to be apprehensive of injury, he cannot require the master to make changes so as to obviate the danger or hold him liable for damages in case of injury. These views are maintained in the following cases: Fleming *v.* St. P. & D. R. R. Co., 6 W. N. Rep., 448; Gibson *v.* Erie R. R. Co., 63 N. Y., 449; Dillon *v.* U. P. R. R. Co., 3 Dill., 320; Owen *v.* N. Y. etc., R. R. Co., 1 Lans., 108; Hayden *v.* Southville M'f'g Co., 29 Conn., 548; Ill. Cent. R. R. Co., *v.* Welch, 52 Ill., 183; Davitt *v.* Pacific R. R. Co., 50 Mo., 302; Baylor *v.* Delaware &c., R. R. Co., 40 N. J. L., 23; Holmes *v.* Clark, 7 Hurlstone & Norman, 937; Woodley *v.* Metropolitan Dist. R. R. Co., 2 Ex. Div., 384."

2. That the peril was one incident to the employment and in contemplation at the time of the contract, and arising from causes open and obvious, the dangerous character of which the deceased had an opportunity to ascertain, and the risk of which he assumed: Schall *v.* Cole, 11 Out., 1.

3. Whenever the facts of a negligence case are undisputed, and it appears clearly that the party injured has been guilty of contributory negligence, it is the right and duty of the Court to take the case from the jury and to give binding instructions to find for the defendant or award a nonsuit: Pittsburgh R. R. Co. *v.* Evans, 53 Pa. St., 250; Dublin &c. R. R. Co. *v.* Slattery, L. R., 3 Appeal Cases, 1155; Dascomb *v.* Buffalo &c. R. R. Co., 27 Barb., 221; Railroad Co. *v.* Stout, 17 Wall., 657; Detroit &c. R. R. Co. *v.* VanSteinburg, 17 Mich., 99; Penna. R. R. Co. *v.* Righter, 2 Thompson's Cases, 220 Johnson *v.* Chicago &c. R. R. Co., 8 Thompson's Cases, 471.

The Courts in Pennsylvania are particularly prone to grant nonsuits. For remarks on this subject, see Smith *v.* Hestonville M. & F. Co., 2 Thompson's Cases, 12.

Mr. Justice TRUNKEY delivered the opinion of the Court, October 4th, 1886.

William Brossman had been in the employ of the defendant as brakeman on a freight train for over two months. He made one round trip each day, and his duties required him to be on the top of the box car. There were a number of bridges over the road so low that a man could not stand erect on the car as it passed under, without striking; the bridge where the accident occurred was about four feet above the top of the cars. That Brossman knew of these bridges, including the one that

3 AMERMAN—32

threw him from the car, is as certain as that he had passed under them daily, when on duty, from the date of his employment.

At the time of the accident Brossman and Hart were together, both familiar with the situation of the bridge; the night was dark and a heavy rain falling, and neither of them gave the slightest attention to the impending danger. Hart says they were not watching for the bridge; had their minds on their work. No lights or any other signal had been on or near the bridge for more than six months to warn the brakemen when near it. During all the time of Brossman's service the hazards of his occupation were the same as when he was employed; no change had been made in the bridges or height of the cars. It is obvious that the bridge was dangerous to the lives of the brakemen, as all bridges are, when so near the top of the cars; and it may be taken as proved that a number of men were injured and some killed by it before the death of Brossman. It also appears that danger signals had been in use at this bridge, but some time before Brossman was employed they were abandoned; and such signals are used by some other railroad companies.

Many points in the argument on behalf of the plaintiff were pressed much as if the deceased had stood in other relation to the defendant than employé. It is hardly necessary to remark that most decisions in cases against railroad companies where passengers were injured, or where persons were injured at street crossings, and the like, have little bearing on the main question presented in this record, namely, did the deceased, after knowledge of the hazardous duties of the place, assume the risk incident to their discharge. Upon this fact there is no conflict of testimony—he knew the danger and risks as well as anybody else, if not at the date of his employment, immediately after he began the performance of its duties.

When an employé, after having the opportunity of becoming acquainted with the risks of his situation, accepts them, he cannot complain if subsequently injured by such exposure. By contracting for the performance of hazardous duties, he assumes such risks as are incident to their discharge from causes open and obvious, the dangerous character of which causes he has had opportunity to ascertain: Wharton on Neg., § 214. This is the general rule. In Ballou *v.* Railway Co., 5 Amer. and Eng. Railroad Cases, 480, the deceased was killed by reason of a defect in the ladder of a freight car, and it was held that his representative could not recover. A well prepared note, reviewing the cases upon the subject, upon the point which touches the case in hand, page 506, states the doctrine as follows: "It seems clear if a person in the employment of

a railroad company discovers that the appliances with which he is working are or have become through use unsafe, and continues without any special order of the company, and without making any complaint, to use the said appliances, that he will be held to have either run the risk of being injured, or to have been guilty of contributory negligence; and hence, in case of injury to him occasioned by such defect, the company will not be liable. And this is true even though the defect be such a one as under ordinary circumstances the company would be bound to repair." If a servant, after discovering the danger of using some appliance, continues to work when he must of necessity use it, he assumes the risk, and the master is discharged from liability: Railroad Co. v. Shertle, 2 Amer. and Eng. Railroad Cases, 158, note.

Thus has the rule been applied in cases of defects in the cars, or appliances, but the doctrine in its application to a case like the present is settled as well as anything can be by repeated adjudications. And its application is less difficult in proportion as the hazard is more certain to be observed by the employé, and being unconnected with the machinery and cars. Where the service of a brakeman is extra hazardous and dangerous on account of a bridge being of insufficient height, of which the brakeman had knowledge while employed, and he continued in the service without objection, he assumed the dangers incident to the service from the bridge in question, and there can be no recovery on account of his death caused by the bridge. The negligence of the employer is waived by the employé remaining in employment without protest or promise of amendment. This waiver cannot be affected by the rapidity or promptness with which he may be required to act at the time of the accident: Wells v. Railroad Co., 56 Iowa, 520.

Where a railroad company negligently plans an obstruction over its roadway, dangerous to the lives of its employés, it fails in its duty to them, and therefore if a person enters the service of the company, in ignorance of such danger and remains ignorant thereof until injured or killed by it, the company is liable for damages. But if the employé had knowledge of the nature and degree of the peril when he entered the service, or continued in the service after such knowledge without protest and promise of amendment, the case is different. The employer has no right to subject his employé to an unnecessary peril without his consent; but it is well settled in the courts of this country and in England, that if a servant chooses to enter into an employment, involving danger of personal injury which the master might have avoided, he takes upon himself the risk of all the hazards incident to the

employment, the existence and nature of which were known to him when he entered the service, and which he had no reason to expect would be obviated or removed. If a servant accepts service with a knowledge of the position of structures from which he has occasion to be apprehensive of injury, he cannot require the master to make changes so as to obviate the danger, or hold him liable for damages in case of injury: Clark *v.* Railroad Co., 28 Minn., 128. By continuing in the master's service, after being fully apprised of its dangerous character, the servant takes upon himself all risks incident to such service: Umback *v.* Railway Co., 8 Amer. and Eng. Railroad Cases, 98.

Decisions in accord with those cited are multitudinous, and the able counsel for plaintiff has adduced none to the contrary. They are too well grounded to be overruled, save by legislative power. When the hazards incident to the duties of the employé are open, before his eyes, meet him every day of his service, and would knock him down if he did not stoop to avoid them, and he continues in the service without promise of amendment, clearly, he accepts the risks of the situation. It is no matter whether danger signals are on other roads, for he was not deceived as to the degree of danger he incurred. Nor is it necessary to consider his rights, or the liability of his employer for damages in case of injury, under a different state of facts.

Judgment affirmed.